## THE KIRNWOOD.

(District Court, E. D. Virginia.  November 27, 1912.)

COLLISION (§ 95*)—TOW AND OVERTAKING STEAMER—FAULT OF STEAMER.

A collision in the daytime, in fair weather, to the south of the middle of the channel in Hampton Roads, between an outgoing steamship and the last of two barges in a tow which she was overtaking, *held* due solely to the fault of the steamship for attempting to pass to the starboard of the tow, so close as to involve risk of collision, without having received assent to her signal, and when a schooner ahead, which had gone to the starboard, had tacked and was heading across the course of the tug a short distance ahead, making it proper and necessary for the latter to change her course somewhat to starboard to pass under the schooner's stern.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty.  Suit for collision by George F. Howland, master of the barge Florida, against the steamship Kirnwood, with the tug Coastwise impleaded.  Decree for libelant against the Kirnwood.

Hughes & Vandeventer, of Norfolk, Va., and Edward E. Blodgett, of Boston, Mass., for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge.  The collision between the steamship Kirnwood and the barge Florida, which is the subject of this litigation, occurred on the evening of the 29th of August, 1912, about 3:30 o'clock, in Hampton Roads, off Old Point Comfort, Va., about half a mile below the Ripraps, slightly to the southward of mid-channel.

The barge Florida, loaded with coal, was the rear of two barges in tow of the tug Coastwise, proceeding to sea, and the Kirnwood was a tramp steamship, loaded with lumber, also bound out of the Capes.  The Coastwise was an ocean-going tug of 268 tons burden, 103 feet long, 25.5 feet beam, and 15 feet draft; and each of the barges were large ocean-going vessels, the forward barge, the I. H. Chapman being 237.5 feet long, 42.7 feet beam, and 19.2 feet draft, with a cargo of about 3,200 tons of coal, and the Florida, 220.4 feet long, 34.8 feet beam, and 25.4 feet draft, with a cargo of 2,100 tons of coal, and each being towed on hawsers, as claimed by the tows, of some 50 fathoms in length, and by the steamship to be considerably longer.  The Kirnwood was a large steamer, 340 feet long, and 1,953 tons burden.  At the time of the collision, the steam barge Jackson was coming in from Chesapeake Bay, on the port side of the tug, and in the immediate vicinity thereof.  The tug Clark, with a tow, was coming up the channel some half mile away, bearing slightly on the port bow of the Coastwise; and the three-masted schooner Edward B. Smith was tacking across the Roads, having gone over on the port tack to the southward of the channel, and shortly before the collision

had put about on the starboard tack to the northward, and across the course of the Coastwise. There were also on the tail of the Horse-shoe, some distance to the eastward of the scene of the accident, several schooners at anchor. The Coastwise was proceeding to sea on a course N. E. by E., and at the Ripraps hauled a little to the eastward; and at the same time the Kirnwood was proceeding to sea on a course N. E. by E. ¾ E. The tide was ebb, the wind blowing slightly from the eastward, weather clear, and no conditions apparent, other than as stated above regarding the shipping in the channel, to have in any way confused or disturbed those engaged in navigation. The tug and tow were moving about 5 knots an hour, and the Kirnwood about 8 knots an hour. Under these conditions, the collision occurred, the Kirnwood striking the Florida virtually at right angles, slightly aft of amidship on her starboard side, causing her to sink in a few minutes.

The libel was filed by the master of the Florida against the steamer Kirnwood, and the latter answered, bringing in the Coastwise under the fifty-ninth admiralty rule. The allegations of fault by the parties, one against the other, are many and varied; but in substance, and in so far as is necessary and material to be stated under the facts and circumstances of the case, they may be summarized as follows:

On the part of the libelant and the Coastwise, that while the Coastwise was on her regular course, proceeding down and slightly to the southward of mid-channel, with two barges following directly behind on hawsers of about 45 fathoms, and navigating with reference to the tug and tow coming in, and the schooner Edward B. Smith tacking across their course, and having slightly ported, with a view of veering to starboard, and passing under the stern of the schooner, without having received any signals from the Kirnwood, or giving any reply to any signals from her, that the steamship approached from the rear, and to the starboard of the Florida, running apparently on parallel courses with them, and, when about lapping the stern of the rear barge, suddenly starboarded and ran into the Florida, and sank her; that no reverse, danger, or other signals were given by the Kirnwood at the time of the latter's change of course.

On the part of the Kirnwood, that when in about five ship lengths of the rear barge, and running on parallel courses therewith, some two or three ship lengths to starboard, and when it was entirely safe and prudent for her so to do, she blew a signal of one blast of her whistle, indicating that she would pass the tug and tow to starboard; that she received no reply, and continued on her course, and when in two ship lengths from the barge gave a second signal of one whistle to indicate the same purpose, to which also she received no reply; that she continued upon her course, which was still considered safe, until the ship's bow overlapped the stern of the Florida, when suddenly the tug changed her course to starboard, crossing the Kirnwood's course, causing the collision; that thereupon the steamship immediately blew a signal of three blasts of her whistle, put her engines full speed astern, and so continued until the collision, having almost entirely killed her headway at the time of impact, and having let go

her starboard anchor just before the vessels struck, in order to help check her way; but the Florida, which had likewise changed her course continued ahead and to starboard, across the course of the steamer, and came into collision with her, the steamer's bow striking the starboard side of the barge just aft of amidship, sinking the barge, and doing serious damage to the Kirnwood; that, but for the sudden and unnecessary change of course to starboard on the part of the Coastwise and tow, the vessels would have passed in safety; and that, immediately upon seeing the tug and tow in the act of making this change, everything was done on board the steamship which could be done to avoid the collision.

On the case thus stated, the question is by whose fault were these two vessels brought into collision, whether the tug for starboarding and crossing the course of the outgoing ship, or the ship for coming into collision with the barge under the circumstances named. At a glance, it will be perceived that, in the absence of negligence on the part of some one, there was no cause for the collision. The channel was about a mile wide, virtually unobstructed, save by the shipping above mentioned; it was broad daylight, the weather apparently perfect, neither wind nor tide to disturb the same; and, indeed, there was nothing to prevent vessels, prudently navigating, from avoiding accidents.

A great number of witnesses were examined—the officers and most of the crew of the tug and two barges and of the Kirnwood; the master and mate of the Jackson, the incoming steam barge, and a passenger thereon, and of the tug Clark, also coming in; the master and mate of the schooner Edward B. Smith; the master of a ferry steamer in the vicinity of the vessels, and officers of a battleship upstream, in full view of the accident, and persons on the wharf at Old Point Comfort, most of whom saw and observed the movements of the two vessels at and about the time of the collision, and who gave their respective accounts of what occurred, some conflicting, but mostly coinciding as to the material points to be determined in the case.

The conclusion of the court, upon a full consideration of the entire testimony, is that it is established, by an overwhelming preponderance of the same, that the collision was brought about as the result of the failure of the steamer Kirnwood, the overtaking vessel, to take timely and precautionary steps to avoid either the collision, or the risk of collision, with the tug and tow ahead of her, and especially in attempting to pass the overtaken tug and tow to starboard, without procuring their assent to such passing, after the Kirnwood had initiated the maneuver by giving proper signals so to do.

The impropriety of attempting to pass this tug and tow in such close proximity was accentuated in this case by the fact that, crossing both the bow of the tug and the steamer, a three-masted schooner was tacking on the starboard tack, in such manner as to cross to the northward over their course, which necessitated, to make safe and possible the maneuver of the Kirnwood, that she should rush across the bow of the schooner, and ahead of the tug boat, which, if successful,

would have resulted almost inevitably in the schooner's colliding with either the tug or part of its tow. It should be borne in mind, in this regard, that the Kirnwood's position is that the schooner Smith was not taken into account by her in passing the tugboat, and that the same was to the southward, and in fact astern of the tug and tow, instead of ahead of it.

This defense of the steamship respecting the presence of the schooner is not supported by the testimony; on the contrary, the evidence overwhelmingly establishes that the schooner passed on the port tack across to the southward, put about, and while on the starboard tack crossed the bow of the tug, some short distance ahead of the same, estimated by most of the witnesses at about 200 feet, and that it was well to the port of the tug and tow at the time of the collision. This portion of the testimony is sustained by the witnesses on both sides, and, indeed, as the court recalls, Capt. Peak, the pilot navigating the Kirnwood at the time of the collision, alone testified that the schooner passed to the northward after the collision.

As viewed by the court, the pilot's navigation of the Kirnwood can only be accounted for by the fact that he failed to take into account the probable movements of the schooner, which was tacking in the vicinity of his course, and which should have been anticipated by him; that he noticed her while going to the southward on the port tack, and failed to timely observe that she had changed her tack, putting her in an opposite direction to which she was first going; and that his idea that she crossed behind the tug and tow arose from seeing her on that side of the channel after the collision, when, of course, the latter vessels, as well as the Kirnwood, had proceeded on their courses further down the channel. The presence of a tacking schooner ahead of and to the starboard of the tug and tow, in these waters and under these conditions, should have admonished the navigator of the Kirnwood that he should not have attempted to proceed to the starboard of the latter vessels, as it placed him necessarily between the same and the schooner; and the steamship's navigator was charged with knowledge, and admits that he knew, that this schooner, proceeding on her port tack, would change her course as soon as the same ran out, and hence involved danger in bringing her across the bow of the tug, or into collision with the outgoing vessels.

The risk involved in this movement was clearly one condemned by the law, and contrary to the rules of good seamanship. The pilot's view apparently was, as he in effect said, that safety consisted in ability to pass clear; and he on two occasions spoke of his ship being "sandwiched in" between the tug and tow and the schooner Smith. It was incumbent upon him, the navigator of an unincumbered vessel, not to have placed himself, in such relation to this sailing vessel and incumbered tugboat, and for injury arising as the result thereof his ship is liable in damages to those sustaining the same. Donald v. Guy (D. C.) 135 Fed. 429, 432.

The pilot of the Kirnwood insists that the navigation of his ship was proper and prudent, and that the collision was only brought about by the improper maneuvers on the part of the Coastwise, in not keep-

ing its course and speed after the Kirnwood's presence was or should have been known, and that the direct cause of the disaster was the tug's changing her course abruptly to starboard across the steamship's course, at a time when it was too late for the steamship to so change or alter her course as to avoid the same, and that he did everything possible, without avail, after such change of course on the part of the tug. This position cannot be conceded here by any means, for the reason that it was the avoidance of the risk of collision, as well as actual collision, with which the unincumbered and overtaking ship was burdened. Rules of Inland Navigation, articles 23, 24; The New York, 175 U. S. 187, 207, 20 Sup. Ct. 67, 44 L. Ed. 126; The Richmond (D. C.) 114 Fed. 208, 213; The Georgetown (D. C.) 135 Fed. 854, 858. Prudent seamanship, with the conditions existing, as shown by the great preponderance of the evidence in this case, would have warned the Kirnwood not to have attempted to pass to starboard at all, with the tacking schooner and tug and tow ahead, and the latter owing the obligation to the former to keep out of the way. The attempt of the ship, under the circumstances, to cut between two vessels, that she was required to keep out of the way of, was almost inexcusable.

It is entirely true that ordinarily a vessel having the right of way owes the obligation to the other vessel to keep her course and speed; but this has no application to the Coastwise on this occasion. She had neither heard the Kirnwood's signals to pass to starboard nor assented to the same. She was at a distance that made it improbable under existing conditions (some 3,000 feet away), running in the face of the wind, that she would have heard the same, and had no right to assume or anticipate that the steamship would attempt to pass by in an open roadstead, in good weather, in the daytime, in such manner as to endanger, or involve the risk of collision with, her tow. The Coastwise owed the obligation to keep out of the way of the schooner, and to avoid crossing ahead of her, unless the circumstances so admitted. If she ported and went astern at the time she did, whether half a point as admitted by her, or 2½ or 3 points as claimed by the schooner, it was what she should have done, if necessary to keep out of the way of the schooner then navigating across her course, and with a view of passing under her stern, and not ahead of her, if the circumstances of the case admitted of her doing so (Inland Rules of Navigation, articles 20 and 22); and certainly she should not be condemned at the instance of the Kirnwood, the unincumbered vessel, which apparently was seeking to pass, not under the stern of the schooner, but ahead both of the tug and tow and of the schooner.

The Kirnwood's claim that she promptly reversed, and gave proper signals, and did all within her power to avoid the collision, after the Coastwise changed its course, is doubtless true; but it was too late to serve any good purpose, in the position in which she had placed herself and the several vessels then were, having regard to the burdens borne by them, respectively, one to the other. The Kirnwood, the overtaking ship, should not have crowded the tug and tow. Article 24, supra. She had ample room to pass to port, there being

no obstruction of the channel to prevent her so doing, and likewise room to pass to starboard, but on the latter side only with the prudence necessary to avoid entanglements arising from the outgoing tug and tow and the tacking schooner, and this appropriate degree of care she utterly failed to exercise. Moreover, she in no event should have continued on her course and speed, and attempted to pass this incumbered vessel, overtaken by her, without receiving the assent required by article 18, rule 8, of the Inland Navigation Rules, which in terms forbade her from doing so.

The Kirnwood having violated the plain and salutary rules prescribed for governing overtaking vessels (Inland Rules of Navigation, rule 8, art. 24, 30 Stat. 96), which in this case sufficiently accounts for the collision, all doubts should be solved against her; and she cannot escape liability by relying upon or suggesting the possible fault of others (The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Victory & The Plymothian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; Foster v. Merchants' & Miners' Transp. Co. [D. C.] 134 Fed. 964, 969).

It follows, from what has been said, that the Kirnwood is solely responsible for causing the collision in question, and a decree may be entered so ascertaining.