## M. & J. TRACY, Inc., v. CATTANEO.

(Circuit Court of Appeals, Fourth Circuit. October 19, 1926.)

No. 2480.

**1. Collision** ⊂⊃39—**Vessel's attempt, without consent, to effect port to port passage after discovery that other vessel was not proceeding on course to affect starboard to starboard passage as previously agreed held inexcusable error.**

Attempt of vessel to effect port to port passage without obtaining consent of other ship on discovery that it was not, as previously agreed, proceeding on course to effect starboard to starboard passage *held* inexcusable error, in view of result, indicating lack of time to effect change.

**2. Collision** ⊂⊃144.

Vessel clearly at fault for changing course without consent of approaching vessel *held* not entitled to apportionment of damages; doubts as to latter vessel's proper navigation being resolved in its favor on conflicting evidence.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk, in Admiralty; D. Lawrence Groner, Judge.

Libel by R. Cattaneo, master of the steamship San Giuseppe against M. & J. Tracy, Inc., owner of the steamship Michael Tracy. Decree for libelant, and respondent appeals. Affirmed.

Earle Farwell, of New York City (George M. Lanning, of Norfolk, Va., Barry, Wainwright, Thacher & Symmers, of New York City, and Baird, White & Lanning, of Norfolk, Va., on the brief), for appellant.

Homer L. Loomis, of New York City (Loomis & Ruebush, of New York City, and Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and SOPER, District Judge.

WADDILL, Circuit Judge. This appeal involves the liability for a collision between the "San Giuseppe," an Italian steamship, and the American steamship "Michael Tracy," which occurred about 7:45 p. m. on October 23, 1924, on the southerly side of the channel between Old Point Comfort and Thimble Shoal Light, at the entrance to Hampton Roads.

The San Giuseppe is a large steamship, 4,859 tons gross, 400 feet long, 52 feet beam, and 28 feet deep. The Tracy is a much smaller vessel of 2,351 tons gross.

At the time of the collision, the San Giuseppe was inward bound in ballast from Philadelphia to Newport News, and the Tracy was outward bound. The San Giuseppe's account of the collision is as follows: On the evening in question, having arrived about 6:25 p. m., at Cape Henry, and taken on board a Virginia pilot, who afterwards controlled the ship's navigation, she was proceeding on her course inward, when, on a line with Thimble Shoal Light and Willoughby Spit buoy, with Old Point about a point on her port bow, the green light of a vessel, which afterwards proved to be the Tracy, was sighted about on a line with the Old Point Light. The San Giuseppe's helm was ported about a point, to provide for a port to port passage; that later the Tracy, which had continued to show her green light, blew two blasts of her whistle, indicating a desire to pass starboard to starboard. This signal was answered, and the starboard to starboard passing agreed to, and the wheel changed to effect this maneuver; and, as the vessels approached each other, and when it was too late to alter the courses agreed upon, the Tracy blew one blast, and a moment later two blasts, which last two blasts were again confirmed by the San Giuseppe; and that, notwithstanding the signals for the starboard to starboard passage, the Tracy swung to starboard, her red light suddenly coming into view, and, in spite of the fact that the San Giuseppe blew danger signals and put her engines full speed astern and dropped her anchor, the collision occurred.

The Tracy says, that while navigating on the southern side of the Old Point channel, and shortly after passing buoy 17, the navigator of the Tracy saw the red side light and white masthead light of an inward bound steamer, which afterwards proved to be the San Giuseppe; that shortly thereafter the Tracy heard a signal of two blasts apparently from the San Giuseppe, and answered with a similar signal, after which her course was changed half a point to port; that the vessels appeared to proceed on their courses for a period of about five minutes, during which time the San Giuseppe continued to hold her course; that it then became apparent to the navigator of the Tracy that the two-blast signal previously mentioned had not been blown by the San Giuseppe, and that the latter was not carrying out the supposed passing agreement, and that, if both vessels held their courses, a collision would occur, and, there being then time to arrange a safe port to port passage, the Tracy blew one blast of her whistle, ported her helm, and went to starboard; that shortly afterwards it was observed that the San Giuseppe was swinging to her port; and that a collision was inevitable; whereupon the Tracy blew one signal, reversed her engines, and, just before the collision, and in order to minimize the damage, went full speed ahead with her helm hard aport.

[1] The scene of the collision was in the open waters of Chesapeake Bay, at the entrance of Hampton Roads, the deep water channel of which was some three quarters of a mile wide, and the depth of the waters generally sufficient for the navigation of the vessels in collision for a much greater distance. The waters in question, that is to say from Thimble Shoal Light to Old Point, are much traversed by commerce of all sorts. Indeed, there is scarcely a busier and more constantly frequented channel along the Atlantic seaboard for the same distance. While thus much opportunity was doubtless afforded for the confusion of signals, there was no real reason nor occasion for the happening of such an occurrence between vessels properly operated by experienced navigators. The Tracy's own account of the bringing about of the collision is that, while meeting an incoming vessel on a course to pass each other starboard to starboard, it suddenly discovered, and in time to have effected a port to port passage, that the other vessel was not proceeding on that course, and the Tracy thereupon proceeded to effect a port to port passage in advance of obtaining the consent of the other ship to do so, which resulted naturally in the two vessels coming together.

This was inexcusable error. The result rather indicated the lack of time to effect the change in course, and manifestly it was reckless to have attempted to do so, without first asking and receiving the assent of the other vessel to the new arrangement.

The learned judge of the district court, who had the advantage of seeing the witnesses and hearing them testify, in an able opinion made a part of the record, held the Tracy responsible for the collision, and the San Giuseppe entirely free from fault. The district judge reached this conclusion as well upon the Tracy's own statement of its conduct as upon full consideration of the entire testimony bearing upon the circumstances of the collision. Considering the case upon the testimony of the master of the Tracy, the district judge said: "If this were all the evidence in the case it would be, obviously, the

duty of the court to hold the 'Tracy' entirely at fault for the collision. Having exchanged signals agreeing to a starboard to starboard passage, it was imperatively her duty to carry out this agreement, unless the assent of the other vessel to a change of course was first obtained, or unless the circumstances under which the vessels were then approaching one another clearly indicated that a collision was likely to occur, in which event he should have sounded danger signals and reversed his engines full speed astern. This the Tracy did not do, but, on the contrary, and by the admission of her master, at a time when the ships were dangerously close together, so that at best it was problematical what the result would be, deliberately changed her course, and in quick succession sounded a number of different signals which, in an emergency, must have been, even if they were as stated by him, unintelligible to the navigator of the approaching vessel. This was negligence for which I can find no excuse."

And upon further consideration of the case, in the light of the entire testimony, the court said: "The evidence, however, I think, overwhelmingly establishes the exchange of signals and the agreement of the vessels to pass starboard to starboard, and, if I am correct in so thinking, it follows that no fault is attributable to the 'Giuseppe' in carrying out this maneuver, nor can fault be imputed to any act of hers after the danger became apparent. The evidence satisfactorily shows that all was done at that time that could be done to avoid the collision. Her engines were put full speed astern, proper danger signals were given, her anchor was heaved overboard, and her headway checked until she must have been almost stationary in the water when the impact occurred, else the damage to the other ship would have been far greater than it was. That she directed her course to port after passing buoy 15, in an effort at a starboard to starboard passing upon a mistaken conclusion as to the character of the whistle sounded by the Tracy, I think unsupported by the evidence, and that she mistook the one blast signal for a two-blast signal I think likewise unsupported by the evidence."

[2] We have given careful consideration to the testimony, and fully concur with the conclusions of the district judge, as we do also with the court's ruling upon the defense interposed by the Tracy as to the Giuseppe's navigation, having for its purpose the holding that ship liable for a part of the damage sustained. The theory upon which the Tracy seeks this relief is well understood, and the authorities make it entirely clear that the Tracy is not entitled to the relief sought, but that, on the contrary, under the testimony here doubts of the character raised respecting the navigation of the Giuseppe should be solved in its favor and against the Tracy. The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 197, 15 S. Ct. 804, 39 L. Ed. 943; The Victory & Plymouthian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Kirnwood (D. C.) 201 F. 428, 433; The North Point (D. C.) 205 F. 958, 963; The Putney Bridge (D. C.) 219 F. 1014, 1016; La Flandre (C. C. A. 3d Cir.) 9 F.(2d) 331.

The decree appealed from will be affirmed, at the cost of the appellant.

Affirmed.